IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GARY IMBRIE, RYAN IMBRIE, and SPERRY
VAN NESS-IMBRIE REALTY LLC,

                              Plaintiffs,

       v.

STATE FARM FIRE & CASUALTY COMPANY,
an Illinois corporation,

                            Defendant.

CV-08-888-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiffs, Gary Imbrie, Ryan Imbrie, and Sperry Van Ness-Imbrie Realty LLC, filed this

action on July 25, 2008, seeking a declaration that defendant, State Farm Fire & Casualty

Company ("State Farm"), has a duty to provide a defense to plaintiffs in a civil lawsuit filed

against them in California state court by Marcus & Millichap Real Estate Investments Services,

Inc. and Marcus & Millichap Real Estate Brokerage Company of Seattle, Inc. (collectively

"M&M").  Plaintiffs also seek damages for breach of contract.   This court has jurisdiction over

this action pursuant to 28 USC § 1332 because there is diversity of citizenship and the amount in

controversy exceeds $75,000 exclusive of interest and costs.

The parties have filed cross motions for summary judgment (docket #7 & #16).  All

parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case

in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons that follow, State Farm's

motion is granted and plaintiffs' motion is denied.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## **BACKGROUND**

The material facts in this matter are not in dispute. Gary Imbrie and his son, Ryan Imbrie, previously worked for M&M at its office in Portland, Oregon, as independent contractor real estate salespersons. M&M is primarily in the business of assisting its clients in the purchase and sale of investment properties throughout the United States. After the Imbries left M&M and formed their own company, Sperry Van Ness-Imbrie Realty, LLC, M&M claims that they stole M&M's customers and business forms, giving them an unfair advantage in competing against M&M for business. As a result, M&M sued the Imbries and their company in California state court alleging seven causes of action: (1) intentional interference with contractual relationships; (2) breach of fiduciary duty; (3) conversion; (4) breach of contract (confidentiality agreement); (5) breach of contract (policy manual); (6) breach of the covenant of good faith and fair dealing; and (7) unfair competition under Cal. Bus. & Prof. Code § 17200. Burke Decl., Ex. B ("*Marcus & Millichap Real Estate Investment Svcs. et al. v. Imbrie, et al.*, Case No. 30-2008, First Amended Complaint, Superior Court of the State of California County of Orange (April 15, 2008) ("M&M Complaint").

State Farm insured plaintiffs at all times relevant to this lawsuit pursuant to a general liability policy. Burke Decl., ¶ 2, Ex. A (State Farm Policy No. 97-EU-3104-6, effective July 19, 2007 to July 19, 2008). Plaintiffs tendered defense of the M&M lawsuit to State Farm. State Farm initially accepted tender under a reservation of rights, but later denied coverage and terminated the attorneys it had retained to represent plaintiffs. Plaintiffs claim that State Farm

has a duty to defend them against the M&M lawsuit, specifically claiming protection under the policy for an "advertising injury." They ask this court to order State Farm to resume defense of the M&M lawsuit and seek to recover damages incurred as a result of State Farm's denial of coverage.

**ANALYSIS**

**I.     Legal Standards**

Because jurisdiction is premised on diversity of citizenship, this court must apply the substantive law of Oregon in resolving the dispute. *See Hayward v. Centennial Ins. Co.*, 430 F3d 989, 991 (2005) (applying state law to an insurance dispute where jurisdiction was based on diversity of the parties). Under Oregon law, the analysis of "[w]hether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy." *Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80, 82 (1994) (citation omitted). "An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy." *Id* at 399-400, 877 P2d at 82. "In evaluating whether an insurer has a duty to defend, the court looks only at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy [.]" *Id* at 400, 877 P2d at 82. "The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage." *Id* at 400, 877 P2d at 83 (citation omitted) (emphasis in original). "Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy." *Id* (citation omitted).

"Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured." *Id* at 400, 877 P2d at 83; *see also Marleau v. Truck Ins. Exchange*, 333 Or 82, 91, 37 P3d 148, 153 (2001) ("if the complaint is unclear, but may be reasonably interpreted to include an incident within the coverage of the policy, [then] there is a duty to defend . . . . It is the substance of the complaint, not its form, that is at the heart of the inquiry.") (internal quotations, citations omitted).

## II.    Insurance Policy Provision

Section II of the policy ("Comprehensive Business Liability," "Coverage L - Business Liability") provides, in pertinent part, as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . **advertising injury** to which this insurance applies.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.  This insurance applies only:
> . . .
> 3.  to **advertising injury** caused by an **occurrence** committed in the **coverage territory** during the policy period.  The **occurrence** must be committed in the course of advertising your goods, products or services.
> -------------------------------------------------------------------------------------
> **Right and Duty to Defend**
> We will have the right and duty to defend any claim or **suit** seeking damages payable under this policy even though the allegations of the suit may be groundless, false or fraudulent.

Burke Decl., ¶ 2, Ex. A, p. 24 (emphasis in original).

The policy defines "advertising injury," in part, as follows:

> 1.    **advertising injury** means injury arising out of one or more of the following offenses:
> . . .
> c.    misappropriation of advertising ideas or style of doing business; or
> d.    infringement of copyright, title or slogan.

5 - OPINION AND ORDER

*Id* at 34 (emphasis in original).

An "occurrence" includes "the commission of an offense, or a series of similar or related offenses, which results in . . . **advertising injury**."  *Id* at 36.  The policy does not apply:

> to **advertising injury** arising out of:
>
> a.    breach of contract other than misappropriation of advertising ideas under an implied contract;
> . . .
> d.    an offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

*Id* at 28 (emphasis in original).

## III.    M&M Complaint Allegations

The M&M Complaint alleges that one of M&M's California competitors, Sperry Van Ness International Corporation ("SVN"), seeking to expand into the Oregon market, targeted and recruited the Imbries who were working for M&M in Oregon.  M&M Complaint, ¶¶ 1-5.  After the Imbries formed their own company, a predecessor to plaintiff Sperry Van Ness - Imbrie Realty, LLC, SVN urged the Imbries "to steal M&M's exclusive clients by inducing them to terminate exclusive listing with M&M and sign up instead with SVN."  *Id*, ¶ 6.  SVN also "encouraged [the Imbries] to misappropriate M&M's confidential transactional documents, and then slap SVN's name and trademark on top of them [and] use them at SVN."  *Id*, ¶ 7.  These allegations underlie each of the seven causes of action asserted in the M&M Complaint.

The first cause of action alleges intentional interference with contractual relations based on plaintiffs, among other things, "advis[ing] and induc[ing] M&M's clients to breach their exclusive representation agreements with M&M and, instead, to list those same properties for sale with SVN."  *Id*, ¶ 20.

6 - OPINION AND ORDER

The second cause of action alleges breach of fiduciary duty by the Imbries.  It alleges that "M&M reposed confidence and trust in the integrity of Gary and Ryan Imbrie," which they voluntarily accepted and then violated in a number of ways, including by "misappropriating" various "proprietary form business documents," including "its form representation agreement and purchase agreement."  *See id*, ¶¶ 26-35.  The importance of these form documents is explained as follows:

> [T]hese form documents provide a distinctive competitive advantage for M&M in the field of commercial real estate.  M&M is an industry leader in the use of prepared real estate form agreements that clearly define the obligations and liabilities of the parties with particular care to the interests of M&M.  M&M has invested substantial amounts in carefully researching drafting, updating, and safeguarding the use of its proprietary form business documents.  The use of the proprietary form agreements in its transactions is an important and material aspect of M&M's success.

*Id*, ¶ 27.

The second cause of action further alleges that the Imbries took these forms with them to SVN and "further breached their duty to M&M by slapping on SVN's logo and using these M&M resources for the benefit of themselves and SVN."  *Id*, ¶ 31.  M&M alleges that the Imbries stole one client whom they required to sign a representation agreement and believes additional discovery will reveal that the Imbries "misappropriated additional exclusive clients of M&M" and "used M&M's proprietary business forms with other SVN clients . . . ." *Id*, ¶¶ 32, 35.

The third cause of action alleges that plaintiffs "wrongfully converted M&M's property including without limitation M&M's proprietary business form documents, which [plaintiffs] wrongfully use in their day-to-day operations."  *Id*, ¶ 40.  Furthermore, "[s]uch property was taken by [plaintiffs] to further their own interests, to gain an unfair advantage in getting SVN's

new Portland real estate office off to a running start, and continue to this day [*sic*] as [plaintiffs] use M&M's own forms in competing against M&M itself." *Id*, ¶ 41.

The fourth cause of action alleges breach of contract by the Imbries for violating their confidentiality agreement with M&M. *Id*, ¶ 47. The Imbries allegedly breached this agreement when they "wrongfully retained and took M&M's proprietary business forms both in hard copy and electronic form and – slapping on SVN's name and trademark on top of them – began using them for SVN immediately upon opening SVN's new Portland office" and by continuing "to use them to date." *Id*, ¶ 50. M&M anticipates that additional discovery will reveal that the Imbries "misappropriated other confidential and proprietary information . . . ." *Id*, ¶ 52.

The fifth and six causes of action allege breach of contract and breach of the covenant of good faith and fair dealing by Gary Imbrie for breaching the terms of M&M's Independent Contractor Policy Manual. *Id*, ¶¶ 55-61, 63-68. This manual provided, in part, that "[a] terminating salesperson shall have no further interest in any listings or purchase agreements as of the date of termination" with certain limited exceptions. *Id*, ¶ 56. Gary Imbrie allegedly breached the terms of the manual when he "misappropriated M&M's exclusive listings of M&M's clients, and listed those same properties for sale with SVN[,] as "[he] undertook these steps to capture any commission resulting from the sale of the Property for himself and SVN, even though he was under a contractual duty to M&M to disclaim any such commission." *Id*, ¶ 59. M&M also anticipates that discovery will uncover additional breaches along these same lines. *Id*, ¶ 61.

And finally, the seventh cause of action alleges that all plaintiffs violated the California

Unfair Competition statute, Cal. Bus. & Prof. Code § 17200, *et seq. Id*, ¶¶ 70-73.  Plaintiffs

allegedly engaged in actions which constitute unfair competition when:

> acting in concert with M&M's competitor SVN, they interfered with
> M&M's contractual relations with its clients, and induced those clients to
> terminate their relationship with M&M, to M&M's detriment.  Moreover,
> [plaintiffs] unlawfully converted M&M's confidential and proprietary
> business forms for their own use, in order to give SVN a further unfair
> advantage in establishing its new Portland office and continuing to operate
> its Portland office.  All of the aforementioned acts by Gary and Ryan
> Imbrie also amount to a breach of fiduciary duty, which is a further act of
> unfair competition.

*Id*, ¶ 70.

## IV.    <u>Discussion</u>

A review of the M&M Complaint reveals two primary allegations that encompass the

wrongdoing that plaintiffs allegedly committed:  (1) stealing M&M's customers by persuading

them to abandon their listing agreements with M&M and sign one with plaintiffs; and

(2) misappropriating M&M's confidential, proprietary business forms, in particular its form

representation agreement and purchase agreement, for use in plaintiffs' day-to-day business

operations.  The parties agree that based on the definitions in the policy, State Farm's duty to

defend is triggered only if the M&M Complaint alleges (1) an injury arising out of one or more

of the listed offenses defined as "advertising injury" (2) which was "caused by an occurrence"

(an offense or group of offenses resulting in advertising injury) committed in the course of

advertising plaintiffs' services.

In interpreting these terms, this court is bound by the interpretive framework set forth by

the Oregon Supreme Court in *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or.*, 313

Or 464, 836 P2d 703 (1992), and its progeny.  *See Groshong v. Mut. of Enumclaw Ins. Co.*, 329

Or 303, 307-13, 985 P2d 1284, 1287-90 (1999) (delineating and applying the *Hoffman*

interpretive framework); *Holloway v. Rep. Indem. Co. of Am.*, 341 Or 642, 649-50, 147 P3d 329,

333-34 (2006) (same).  Pursuant to the *Hoffman* framework, the question of policy interpretation

is one of law, and "'[t]he primary and governing rule of the construction of insurance contracts is

to ascertain the intention of the parties.'"  *Hoffman*, 313 Or at 469, 836 P2d at 706, quoting

*Totten v. N.Y. Life Ins. Co.*, 298 Or 765, 770, 696 P2d 1082, 1086 (1985) (brackets in original).

The parties' intent is determined "based on the terms and conditions of the insurance policy"

itself.  *Id*.  Accordingly, in construing a particular term, the court first looks to any definition

provided in the policy.  *Id*; *Groshong,* 329 Or at 307-08, 985 P2d at 1287.   If the policy does not

define the term at issue, the court must "resort to various aids of interpretation to discern the

parties' intended meaning."  *Groshong*, 329 Or at 307-08, 985 P2d at 1287.  The first step in this

process is to determine whether the term has a "plain meaning, *i.e.*, whether it is susceptible to

only one plausible interpretation."  *Holloway*, 341 Or at 650, 147 P3d at 333 (internal quotations,

citation omitted).  If the phrase has a plain meaning, then the court applies this meaning without

further analysis.  *Id*.  If the phrase is susceptible of more than one plausible interpretation, then

the court proceeds to the second interpretive aid, namely an analysis of the phrase "in light of the

particular context in which [it] is used in the policy and the broader context of the policy as a

whole."  *Id* at 650, 147 P3d at 334 (internal quotations, citation omitted).  If the phrase remains

ambiguous, then, and only then, "any reasonable doubt as to the intended meaning of such a term

will be resolved against the insurance company."  *Id*  (internal quotations, alterations, and

citation omitted).

Applying this framework, this court concludes that the M&M Complaint fails to allege an advertising injury and, thus, State Farm has no duty to defend plaintiffs against the M&M lawsuit.

### A.   <u>Advertising Idea</u>

As indicated above, the policy lists several definitions for "advertising injury."  Plaintiffs primarily rely on the definition of "advertising injury" as a "misappropriation of advertising ideas or style of doing business."  The policy does not provide a definition for the first part of this definition premised on "advertising ideas."  However, this term is susceptible of a plain meaning.  A suitable definition for the noun "idea" is "a preliminary plan: conception, design; usu[ally]: a plan or purpose of action:  project."  WEBSTER'S THIRD NEW INT'L DICT., 1122 (unabridged ed. 1981) ("WEBSTER'S").  This noun is modified by the word "advertising," which functions as an attributive noun in this context meaning "the action of calling something to (as a commodity for sale, service offered or desired) to the attention of the public esp. by means of printed or broadcast paid announcements."  *Id* at 31.

Thus taking these definitions together, in order to allege the misappropriation of "advertising ideas," the M&M Complaint must allege that the plaintiffs misappropriated a plan, conception, or design aimed at calling M&M's services to the attention of the public.[1]  The M&M Complaint contains no such allegation.  While it does allege that plaintiffs stole M&M's form documents and that these form documents are "material" to M&M's success, the M&M

---

[1] Other courts have similarly defined "advertising idea."  *See Atl. Mut. Ins. Co. v. Badger Med. Supply Co.*, 191 Wis 2d 229, 239, 528 NW2d 486, 490 (1994) (consulting dictionary definitions, including WEBSTER'S, to determine that "[a]n advertising idea . . . is an idea for calling public attention to a product or business, especially by proclaiming desirable qualities so as to increase sales or patronage"); *Am. Econ. Ins. Co. v. Reboans, Inc.*, 852 F Supp 875, 879 (ND Cal 1994) ("'advertising ideas or style of doing business' refers to the mode of presenting a product to the public").

Complaint does not tie these forms to any advertising idea conceived or employed by M&M.

According to the M&M Complaint, the major advantage M&M receives from these forms is that

they "clearly define the obligations and liabilities of the parties with particular care to the

interests of M&M."  This does not pertain to "advertising ideas."

###    B.    Style of Doing Business

The alternative part of this same definition of advertising injury is a misappropriation of a

"style of doing business."  The policy does not define this phrase.  However, its meaning is

easily discerned by giving the words their ordinary and usual meaning as they appear in their

immediate context.  The word "style" has many definitions, of which the most apropos in context

is "the peculiarly distinctive technique or methods characteristics of or identified with a

particular individual usu[ally] in the performance of a particular activity."  WEBSTER'S, 2271.  A

contextually relevant definition of "business" is "a usu[ally] commercial or mercantile activity

customarily engaged in as a means of livelihood and typically involving some independence of

judgment and power of decision."  *Id* at 302.  Thus, in order to allege an "advertising injury," the

M&M Complaint must allege an injury arising out of the misappropriation of M&M's

"peculiarly distinctive technique or methods or characteristics" of "commercial or mercantile

activity."

Used in this sense, a "style of doing business" is akin to the concept of trade dress which

has been defined to include "the total image of a product and may include features such as size,

shape, color or color combination, texture, graphics or even particular *sales techniques*."  *Two

Pesos Inc. v. Taco Cabana, Inc.*, 505 US 763, 765 n.1 (1992); *see also Clicks Billiards Inc. v.

Sixshooters Inc.*, 251 F3d 1252, 1258-61 (9th Cir 2001) (finding that the overall layout and decor

of a business can be protectable trade dress"); *Hyman v. Nationwide Mut. Fire Ins.*, 304 F3d

1179, 1189 (11th Cir 2002) (finding that misappropriation of an advertising idea or style of doing

business can include trade dress infringement under the definition of "advertising injury" in a

CGL policy).

It is not the misappropriation of just one minute facet of a business that must be alleged.

Rather, the misappropriation must be of a company's "peculiar" or "distinctive" methods,

characteristics or techniques employed in engaging in commercial activity.  In other words, a

style of business is what sets one company apart from its competitors in the same industry.

Thus, the term "style of business" in context refers to "'a company's comprehensive manner of

operating its business.'"  *Atl. Mut.*, 191 Wis 2d at 239, 528 NW2d at 490, quoting *St. Paul Fire*

*& Marine Ins. Co. v. Advanced Interventional Sys., Inc.*, 824 F Supp 583, 585 (ED Va 1993).

The only misappropriations alleged in the M&M Complaint are of its customers and its

proprietary forms.  Of the two, only the latter could potentially invoke a style of doing business.

In this case it does not.  Nothing in the M&M Complaint indicates that the use of its proprietary

listing and purchase agreements is a comprehensive manner of operating its business that

distinguishes it from others real estate businesses in the industry.  M&M does allege that it is "an

industry leader" in the use of prepared form documents and that these forms provide it with a

"distinct competitive advantage."  M&M Complaint, ¶ 27.  However, it does not take the next

necessary step and allege that this advantage comes from its customer's knowledge or opinions

of these forms or that the forms in any way set its business apart from others in the eyes of its

clients.

The use of standardized forms by a business itself is hardly unusual, and the M&M

Complaint does not specify what makes its forms different except that they "clearly define the

obligations and liabilities of the parties with particular care to the interests of M&M." *Id*.  From

this it appears that the major benefit of the forms is not realized until a customer has learned of

M&M and has already determined to use its services.  Once the customer has agreed to enter into

a listing or purchase agreement with M&M, the proprietary form assures the ultimate success of

the transaction.  Arguably, M&M would not have lost any of its clients to SVN had the primary

advantage of its business been its unique forms, since these clients would have had no incentive

to switch to SVN having already benefitted from the forms through M&M.  However, the M&M

Complaint alleges that the major benefit plaintiffs received by misappropriating the forms was in

allowing them "to gain an unfair advantage in getting SVN's new Portland real estate office off

to a running start." *Id*, ¶ 41.  In other words, rather than having to come up with forms of their

own, SVN was able to begin business with the tested and proven forms of M&M.  Thus, it was a

gain in efficiency of operations, and not notoriety with customers, that the M&M forms

provided.  This is not an "advertising injury."

      **C.**      **Infringement of Copyright, Title or Slogan**

At oral argument, counsel for plaintiffs also asserted potential coverage under the

definition for "advertising injury" as an injury arising out of the "infringement of copyright, title

or slogan."  The court rejects this argument for two reasons.  First, it was asserted for the first

time at oral argument and neither party offered argument or analysis on this point.  Second, the

M&M Complaint reveals no allegations asserting an infringement of a copyright held, title to

any property belonging to, or slogan used by M&M.

**ORDER**

Because the M&M complaint does not allege an "advertising injury" and none of the

allegations support a coverable claim on any other basis, State Farm has no duty to defend

plaintiffs in the M&M lawsuit.  As a result, State Farm's motion (docket #16) is GRANTED and

plaintiffs' motion (docket #7) is DENIED.

DATED this  24th day of October, 2008.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge